DANTE MIRABELLA
    Plaintiff

V.                                       CIVIL ACTION NO. 20-11520-IT

SHERIFF STEVEN TOMPKINS, ET AL.
    Defendants

## DEFENDANT'S OPPOSITION TO THE
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

The Defendant Sheriff Steven Tompkins, hereby submits his opposition to Plaintiff Dante Mirabella's Motion for a Preliminary Injunction ("**PI**"). Defendant Steven Tompkins is the Sheriff of Suffolk County, and is responsible for the operations of the Suffolk County Sheriff's Department ("**SCSD/Department**"), which includes oversight of the Nashua Street Jail, and the Suffolk County House of Correction.

On August 13, 2020, the Plaintiff filed a Complaint (***Dkt No. 1***), and a Motion for a Preliminary Injunction. (***Dkt No. 3***) The crux of the Plaintiff's Complaint is that he is a drug addict and that his requests to be in the MAT ("**Medication Assistance Treatment**") program where he can receive the medication Suboxone for opiate addiction have been denied. The Plaintiff alleges that as a result of the Defendants'[1] actions, in refusing to provide him with Suboxone, his rights under the Americans with Disabilities Act have been violated. The Plaintiff also asserts that his rights under the 8th and 14th Amendment, pursuant to 42 U.S.C. § 1983, have also been violated as a result of deliberate indifference to his serious medical needs.

---

[1] Dr. Chaudhary, the former medical director for NaphCare, Inc., ("**NaphCare**") the contracted medical provider for the Suffolk County Sheriff's Department, has also been named as a Defendant in the Plaintiff's Complaint; however the Plaintiff has not yet served Dr. Chaudhary.

Plaintiff seeks injunctive relief in the form of a judicial order that (if issued) would, enjoin the Defendants from denying the Plaintiff access to the medication Suboxone. Sheriff Tompkins respectfully requests that this Honorable Court deny the Plaintiff's Motion for Injunctive Relief, because the Plaintiff has not demonstrated a likelihood of success on the merits, or a significant risk of irreparable harm in the absence of preliminary injunctive assistance. Further, granting an injunction would negatively affect the public's interest.

## FACTS

The Plaintiff, Dante Mirabella, (a 55 year old pre-trial detainee at the South County House of Correction), was committed to the Nashua Street Jail on June 3, 2019 (***Dkt. No. 1***):

1.  On June 3, 2019, when Dante Mirabella was committed to the Nashua Street Jail, he met with a nurse who completed a comprehensive medical intake. Mr. Mirabella reported that he was presently taking Gabapentin and the psychiatric medication Vraylar. A taper of Gabapentin was ordered because Mr. Mirabella was not taking it for diabetic neuropathy or a seizure disorder. The medication Vraylar was ordered for Mr. Mirabella. While Mr. Mirabella reported a history of opiate and cocaine use he informed medical staff that "he "will not be detoxing while here." (***Exhibit 1***)

2.  Mr. Mirabella was not asked and did not self-report Suboxone use in the community. (***Exhibit 1***)

3.  On June 5, 2019, Mr. Mirabella met with a mental health practitioner ("**MHP**") and informed her that he was doing "ok" and currently detoxing from substances and alcohol. In the treatment plan the MHP noted that he did not present with any acute distress and that he was future oriented to resolving legal issues and addressing his mental health needs. (***Exhibit 1)***

4.  On June 6, 2019, Mr. Mirabella had a physical assessment completed by a Nurse Practitioner ("**NP**"). The NP noted that the patient was primarily focused on pain to his neck, back and shoulders. Mr. Mirabella reported that he as taking Gabapentin for "pain and nerve management and requested to have Gabapentin ordered long term. Mr. Mirabella was informed that the Gabapentin taper would end and that there were alternative medications like Cymbalta or Elavil for pain management. Mr. Mirabella agreed to a prescription for 600 mg of Ibuprofen BID/PRN ordered for 14 days. The NP indicated that she would request records treatment records from Mr. Mirabella's doctors to confirm disease and surgical history. (***Exhibit 1***)

5.  On June 10, 2019, Mr. Mirabella met with a psychiatric NP for an evaluation. Mr. Mirabella informed the NP that he had a history of bipolar disorder. He requested to cease Vraylar due to restlessness consistent with akathisia, and resume Zyprexa. The NP discontinued Vraylar and prescribed 10mg of Zyprexa for mood stabilization. (***Exhibit 1***)

6.  On June 13, 2019, Mr. Mirabella was transferred to the SCHOC where he had a second physical

exam.  Mr. Mirabella denied any questions or concerns at that time. (**Exhibit 2**)

7.     On June 15, 2019, Mr. Mirabella put in a sick slip for melatonin because he was having difficulty sleeping.  (**Exhibit 2**)

8.     On June 21, 2019, Mr. Mirabella was admitted to the medical housing unit for neurological checks after an altercation with another inmate.   Mr. Mirabella sustained a one-half (½) dollar size hematoma to the right side of his forehead. Mr. Mirabella remained in the infirmary until June 25, 2019. (**Exhibit 2**)

9.     On June 21, 2019, Mr. Mirabella had a follow up with psychiatry.  3 mg of Melatonin was started for sleep and Zyprexa was increased to 15mg QHS for mood and anxiety. (**Exhibit 2**)

10.    On July 2, 2019, Mr. Mirabella was seen for a blood pressure review and shoulder pain. He was prescribed Lisinopril 5mg and Motrin 600mg PRN x 2 weeks. (**Exhibit 2**)

11.    On July 16, 2019, Mr. Mirabella met with a mental health practitioner and reported that things were "So far so good!" and that the melatonin that he had requested one month ago has produced significant positive changes in his ability to sleep.  (**Exhibit 2**)

12.    On July 29, 2019, Mr. Mirabella met with the medical doctor for a chronic care visit.  (**Exhibit 2**)

13.    On August 8, 2019, Mr. Mirabella met with a mental health practitioner.  Mr. Mirabella reported that things were "pretty good" and that he was spending time watching television, taking advantage of getting outside for fresh air when possible, and socializing with others.  (**Exhibit 2**)

14.    On August 28, 2019, Mr. Mirabella met with the psychiatrist, Dr. Hidalgo, to discuss concerns about his case (masked armed robbery and possession of a firearm) which was causing him to be "really down on himself" because "he never thought he would be involved with jail again."  The doctor noted that Mr. Mirabella presented with a moderate level of depression in the context of bipolar disorder and also noted low mood, poor sleep and ruminating thoughts. The doctor discontinued the prescription for Cymbalta and began a trial of Trileptal.  (**Exhibit 2**)

15.    On September 10, 2019, Mr. Mirabella met with a mental health practitioner and they discussed how he has been managing in his current environment.  The clinician provided him with a composition book because he had journaled daily for the past 20 years.  The clinician noted that Mr. Mirabella appeared to be functioning well in the current environment and he did not present as hopeless or exhibit any changes to mood.  (**Exhibit 2**)

16.    On September 30, 2019, Mr. Mirabella had a follow up appointment with Dr. Hidalgo.  He reported that the change in medication had been helpful, and he reported improved symptoms of mood, anxiety and sleep. (**Exhibit 2**)

17.    On October 30, 2019, Mr. Mirabella met with Dr. Michaud for a chronic care visit to address his hypertension issues.  (**Exhibit 2**)

18. On December 20, 2019, Mr. Mirabella met with a mental health clinician and reported that despite his efforts to contact his family they had not accepted his calls. He stated that his family has been aloof since his eight (8) month incarceration which followed a relapse after ten (10) years of clean time. Mr. Mirabella denied any other questions or concerns. (***Exhibit 2***)

19. On December 23, 2019, Mr. Mirabella met with Dr. Hidalgo for a follow up psychiatric visit. Dr. Hidalgo noted that Mr. Mirabella's mood was stable except for sadness around the holidays and disconnection from his family. Trileptal was increased to 600mg in part to treat his neuropathy. (***Exhibit 2***)

20. On January 15, 2020, Mr. Mirabella met with a mental health clinician and discussed family stressors and how to manage distress tolerance and the concept of instant gratification vis-a-vis family relationships. Mr. Mirabella denied sleep issues and stated that his appetite was not bad. He denied any other questions or concerns. (***Exhibit 2***)

21. On January 23, 2020, Mr. Mirabella met with a mental health clinician and reported that he had two upcoming court dates and that the conditions of his release would necessitate his acceptance to a residential substance abuse program. Mr. Mirabella felt overwhelmed because he had not started the application process. The clinician provided the application process information. (***Exhibit 2***)

22. On February 5, 2020, Mr. Mirabella was caught "cheeking" his medication and Dr. Hidalgo ordered that Benadryl be discontinued, and that the remaining medications- Trileptal, Zyprexa and Melatonin be crushed before Mr. Mirabella received them. (***Exhibit 2***)

23. On February 14, 2020, Mr. Mirabella met with a mental health practitioner who noted that he appeared to be "functioning well in current environment, and does not present as hopeless or exhibit any changes to mood." (***Exhibit 2***)

24. On March 20, 2020, Mr. Mirabella requested to be put on Suboxone because he was concerned about overdosing if he was released from prison. He was provided with a MAT request authorization form and instructed to complete and submit the form to his caseworker. (***Exhibit 2***)

25. On March 27, 2020, Mr. Mirabella met with a mental health practitioner. Mr. Mirabella denied any issues with mood, sleep or appetite, and did not have any other questions or concerns. (***Exhibit 2***)

26. On April 1, 2020, Mr. Mirabella submitted a grievance indicating that he wanted to be on Suboxone in the event that he is released from custody. Mr. Mirabella did not appeal the grievance. (***Exhibit 8***)

27. On April 27, 2020, Mr. Mirabella saw the medical doctor for a chronic care visit due to hypertension. The doctor noted that his hypertension was slightly worse however advised to continue with the same treatment. (***Exhibit 2***)

28. On April 28, 2020, Mr. Mirabella met with a mental health practitioner and stated that he was

anticipating a federal sentence where he was going to pursue training as a barber or perhaps complete a college degree. He indicated that he was still having sleep issues and questioned why Benadryl was not continued. (***Exhibit 2***)

29. On April 30, 2020, Mr. Mirabella was seen by Dr. Hidalgo who noted that Mr. Mirabella is a 53 year old male with a history of bipolar disorder currently prescribed Zyprexa 20mg QHS, Benadryl 50mg, Trileptal 600mg bid, and Elavil 25mg. Mr. Mirabella asked about Benadryl. The doctor noted that Mr. Mirabella "did not endorse any mood or psychotic symptoms, or suicidal ideations or safety concerns. His main concern was to resume Benadryl." (***Exhibit 2***)

30. On May 29, 2020, a mental health practitioner met with Mr. Mirabella. He told her that he was doing "ok" and reported that his appetite and sleep were both good. Mr. Mirabella denied any questions or concerns. (***Exhibit 2***)

31. On June 25, 2020, Mr. Mirabella declined to meet with the mental health practitioner. He called out to security stating: "Tell her I'm good." When the MHP checked with security they had no issues to report concerning Mr. Mirabella. (***Exhibit 2***)

32. On July 1, 2020, Mr. Mirabella had his annual physical assessment and informed the physician that in the past he had used heroin/fentanyl, and benzodiazepines as well as Suboxone, however, he was never prescribed Suboxone [by a doctor]. (***Exhibit 2***)

33. On July 22, 2020, Mr. Mirabella was seen by the doctor for follow up for an asthma condition. (***Exhibit 2***)

34. On July 23, 2020, Mr. Mirabella met with the mental health practitioner for his monthly one to one visit. Mr. Mirabella reported that "I'm doing really well. I get along with everyone, talk to my girlfriend often… and the psychiatrist has prescribed me medication for my tremors." Mr. Mirabella denied any other questions or concerns. (***Exhibit 2***)

35. On July 28, 2020, Mr. Mirabella met with Dr. Hidalgo who noted that Mr. Mirabella presented with a stable mood and no psychosis and that his medication regime was effective in treating his symptoms. Mr. Mirabella was beginning to show early signs of TD and they decided that he should continue on Zyprexa as it had been effective in controlling his mood and psychosis. A trial of Wellbutrin was commenced. (***Exhibit 2***)

36. On August 4, 2020, Mr. Mirabella put in a sick slip stating that he was supposed to see the doctor for the MAT program and asked when it was going to happen as it had been a week. The response was that "Medical is conferring with the MAT team to decide course of action once you leave here." (***Exhibit 2***)

37. On August 25, 2020, Mr. Mirabella met with his mental health practitioner and expressed worry about his girlfriend. The MHP discussed Mr. Mirabella's non-compliance with his medication Cogentin. He admitted his need for the medication and reported that he would take it as

prescribed.  He denied issues with sleep and appetite. The clinician notes no acute mental health and safety concerns voiced or detected during interaction. (***Exhibit 2***)

38.   The purpose of treating addiction with Suboxone is to prevent the addict from getting high or overdosing on other opiates.  Providing Suboxone in correctional facilities affords continuity of treatment to those individuals who were engaged in treatment prior to their arrest, and as a means of initiating treatment for individuals suffering from Opioid Use Disorder.  Optimizing continuity of care between the prison and the community is a public health imperative. (***Exhibit 1***)

39.   Within the Suffolk County Sheriff's Department effecting the transition from the traditional medical approach of detoxification of inmates and detainees to the public health approach, which necessarily encompasses treatment for all inmates with opioid addiction, required additional resources and program enhancements. (***Exhibit 1***)

40.   Prior to the Department's initiation of the MAT program there were no providers on staff at the Jail or the SCHOC who were certified to prescribe Suboxone. To prescribe Suboxone, practitioners must obtain a waiver to practice opioid dependency treatment with approved buprenorphine medications, which requires submitting a notification of intent to the Center for Substance Abuse Treatment ("***CSAT***") within the Substance Abuse and Mental Health Services Administration of the U.S. Department of Health and Human Services. The notification of intent must contain information on the practitioner's qualifying credentials and additional certifications, including the practitioner's capacity to refer patients for appropriate counseling and other services. It must also confirm that the practitioner will not have more than 30 patients at any one time for the first year, regardless of the number of practice locations. The practitioner must also provide a training certificate demonstrating the completion of eight hours of required training to prescribe and dispense buprenorphine. After one year, the practitioner may apply to treat up to 100 patients. (***Exhibit 1***)

41.   When Suboxone treatment is provided, it must be part of a comprehensive program that includes counseling, classes, education, and social support. All of these elements had to be in place before Suboxone treatment was initiated on September 1, 2019.  Pursuant to a competitive procurement, on or about August 19, 2019, the Suffolk County Sheriff's Department selected Spectrum Health Systems, Inc. as the vendor to provide such programming.  (***Exhibit 1***)

42.   It is the opinion of Dr. James Quirk that it is harmful to place a patient on Suboxone unless there is a clearly delineated continuity of care plan upon release from SCSD, either to the community or another correctional facility.  If a plan for continuity of care is not in place, the patient may unnecessarily face the risk drug detoxification. (***Exhibit 1***)

On August 9, 2018, Governor Baker signed into Law "An Act for the Prevention and Access to Appropriate Care and Treatment of Addiction." (***Exhibit 3***)  This Law, among other things,[2] instituted a five Sheriff MAT pilot program in concert with the department of public health, the executive office of public safety and security, and the office of Medicaid.  The purpose of the Act was to institute a program for county correctional facilities to "possess, administer and dispense all drugs approved by the federal Food and Drug Administration for use in medication-assisted treatment for opioid use disorder…" to be implemented no later than September 1, 2019. (***Exhibit 3***)  The five counties who were initially approved for this program were Franklin, Hampden, Hampshire, Middlesex and Norfolk; however the Sheriffs of Suffolk County and Essex County asked to be included in this program. (***Exhibit 4***)  On January 9, 2019, Section 98 of chapter 208 of the Acts of 2018 was amended to include Suffolk County and Essex County in this program. (***Exhibit 4***)  Out of the fourteen counties in MA only seven have a MAT program. (***Exhibit 7***)

On August 22, 2018, the SCSD, and NaphCare, the contracted medical provider for the SCSD, signed a Rider to their contract, to formally implement a MAT program at the Nashua Street Jail, and the Suffolk County House of Correction, to commence on September 1, 2019, consistent with the terms of Chapter 2018, HB 4742. (***Exhibit 5***)[3]  NaphCare, has also established guidelines for NaphCare's participation in Medication assisted Treatment (MAT) programs in its contracted facilities. (***Exhibit 6***)

### MAT Program at the Suffolk County Sheriff's Department

1. For pre-trial detainees, and sentenced inmates committed to the SCSD, NaphCare, Inc., continues to provide MAT to those who were on MAT in the community, immediately before their incarceration, as set forth in the law. (***Exhibit 7***)

---

[2] An Act for the Prevention and Access to Appropriate Care and Treatment of Addiction is part of a broader piece of Legislation signed by Governor Baker to combat the opioid epidemic in Massachusetts.

[3] This program formally went into effect in both facilities on August 26, 2019.  (***Exhibit 3***)

2. For sentenced inmates at the SCHOC who were not on MAT in the community but who express a desire to commence MAT, NaphCare, Inc., ensures that they are on MAT at least 30 days prior to release if not sooner, as required by the law. (***Exhibit 7***)

3. For pre-trial detainees who were not on MAT in the community but express an interest in commencing MAT, the Department and NaphCare, Inc., approach each and every patient on a case by case basis by taking into consideration: their medication history; their addiction history; whether they have been diagnosed with an opioid use disorder; their bail; and where they will be transferred or sentenced after their release from the SCSD. (***Exhibit 7***)

4. Currently there are 36 sentenced inmates and 83 pre-trial detainees participating in the MAT program at both the Nashua Street Jail and the SCHOC. (**Exhibit 7**)

5. If a pre-trial detainee has a federal charge, or if a detainee has an outstanding criminal matter in another County, the Department will work with their criminal attorney in order to determine the best course of action. This is due to the fact that many if not most federal prisons do not have a MAT program, which allows for sentenced inmates to remain on Suboxone. Therefore, at many federal prisons inmates are tapered off of Suboxone upon their commitment. This also applies to the Counties outlined in footnote one (1) who do not have MAT programs. (***Exhibit 7***)

6. Prior to his incarceration Mr. Mirabella had never been prescribed Suboxone through a legally authorized program, and did not have a valid prescription for Suboxone in the community. (***Exhibit 7***)

7. Prior to March of 2020, Mr. Mirabella never informed medical or mental health staff that he wanted to participate in the MAT program. After Mr. Mirabella requested to be considered for the MAT program, he was provided with a form to complete because he had been with the Department for a significant period of time and had never expressed an interest in the program. Further, Mr. Mirabella had never expressed concerns about his drug addiction while incarcerated. (***Exhibit 7***)

8. In May of 2020, a Wellness Navigator met with Mr. Mirabella and conducted a full assessment to determine whether he was a candidate for the MAT program. This is when it was first learned that he had a federal case, and that he might be sentenced on that case within the next few months. (***Exhibit 7***)

9. Mr. Mirabella was informed that to even be considered for Suboxone he needed to participate in weekly treatment groups, and that he needed to complete weekly recovery packets, when groups were unavailable due to the coronavirus pandemic. Mr. Mirabella has been attending the weekly treatment groups as of 9/14/20. (***Exhibit 7***)

10. Courtney Waldron, treatment coordinator for the SCSD's MAT program was in contact with Mr. Mirabella's former criminal attorney, Federal Defender Oscar Cruz and his current criminal attorney Kevin Barron. On August 25, 2020, Ms. Waldron spoke to Attorney Cruz and expressed her concern that because of Mr. Mirabella's federal charge if he was started on MAT at the SCHOC there was a strong likelihood that he would be tapered off of Suboxone when he was detained and/or sentenced to a federal facility. (***Exhibit 7***)

11. It was Ms. Waldron's understanding, after speaking with Attorney Cruz, that Mr. Mirabella was scheduled to appear in Federal Court for a hearing on September 10, 2020, and that it would most likely be a plea hearing. (*Exhibit 7*)

12. Attorney Cruz informed Ms. Waldron that he was going to try to get Mr. Cruz detained and/or sentenced to a federal facility in Rhode Island that has a MAT program. (*Exhibit 7*)

13. On September 30, 2020, Attorney Cruz e-mailed Ms. Waldron to let her know that he was off of the case, and that Mr. Mirabella had new counsel, attorney Kevin Barron. (*Exhibit 7)*

14. On October 6, 2020, Ms. Waldron spoke with Attorney Barron who informed her that he was also going to work on trying to get Mr. Mirabella detained and/or sentenced to a federal facility that has a MAT program. (*Exhibit 7*)

### ARGUMENT

The Defendant respectfully requests that this Honorable Court deny Plaintiff's Motion for a Preliminary Injunction because Plaintiff fails to meet the necessary criteria for the issuance of an injunction pursuant to Fed.R.Civ.P. 65(b). The standards for the consideration of a request for an injunction are well-settled. "In ruling on a preliminary injunction motion, a district court must ask whether the moving party has established that (1) it has a substantial likelihood of success on the merits, (2) there exists, absent the injunction, a significant risk of irreparable harm, (3) the balance of hardships tilts in its favor, and (4) granting the injunction will not negatively affect the public interest. TEC Engineering Corp. v. Budget Molders Supply Inc., 82 F.3rd 542, 544-545 (1st Cir. 1996). See, e.g., Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 699 n. 2 (1st Cir.1987). "[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." Canal Authority of State of Florida v. Callaway, 489 F.2d 57, 573 (5th Cir. 1973). "The likelihood of success on the merits is the critical factor in preliminary injunction analysis. Schofield v. Clark, 686 F.Supp. 124, 126 (2010)(quoting Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)). The First Circuit has emphasized that if a moving party cannot establish a likelihood of success on the merits, then the rest of the factors

simply become "matters of idle curiosity." <u>Aborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc</u>., 794 F.3d 168, 173 (1st Cir. 2015).

## I. PLAINTIFF CANNOT DEMONSTRATE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

### a. Plaintiff will be Unable to Demonstrate a Strong Likelihood of Success on the Merits because he Failed to Exhaust his Administrative Remedies Prior to filing his Complaint.

The Prison Litigation Reform Act ("*PLRA*") provides, in pertinent part:

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. §1997e(a). As such, in order to satisfy the PLRA's requirement, an inmate must properly exhaust all available administrative remedies. *See* <u>Woodford v. Ngo</u>, 548 U.S. 81, 87-88 (2006). Proper exhaustion means that an inmate must complete the administrative review process in accordance with the applicable procedural rules, "because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *See* <u>Id</u>. at 90-91. The federal courts have repeatedly noted both the mandatory and unforgiving nature of the PLRA's exhaustion requirement. *See* <u>Id</u>. at 85 ("Exhaustion is no longer left to the discretion of the district court, but is mandatory."); <u>Casanova v. Dubois</u>, 289 F.3d 142, 147 (1st Cir.2002) ("the exhaustion requirement is nevertheless mandatory.").

In considering whether the Plaintiff has exhausted administrative remedies, the court "must look to the time of filing", not the time the court is making its decision. <u>Tolbert v. Clarke</u>, 685 F.Supp.2d 244, 247 (D. Mass. 2010) (citation omitted). Dismissal is appropriate where an inmate fails to exhaust administrative remedies *prior to* filing a claim in federal court. <u>Medina-Claudio v. Rodriguez-Mateo</u>, 292 F.3d 31, 36 (1st Cir. 2002); *see also* <u>Oladukun v. Winn</u>, 2005 WL 1972560, *6 (D. Mass. Aug. 16, 2005)(noting that plaintiff, who filed his grievance appeal after the commencement of the lawsuit, failed to exhaust administrative remedies).

Formal grievance and appeal procedures were available to the Plaintiff as set forth in the SCSD's Inmate Grievance Policy – S491 (**Exhibit 8**) This policy requires that if an inmate is not satisfied with the grievance response he received from the Institutional Grievance Coordinator that, he must file an appeal to the Superintendent within ten (10) working days from . (**Exhibit 8**) Mr. Mirabella filed only one grievance seeking Suboxone dated March 30, 2020; however and he failed to exhaust his administrative remedies because he did not file an appeal of this grievance. (**Exhibit 8**) "The First Circuit has stated that a prisoner must exhaust his administrative remedies before a complaint under § 1983[4] will be entertained even where the relief sought cannot be granted by the administrative process." Johnson v. Thyng 369 F. App'x 144, 147 (1st Cir. 2010)(quoting Booth v. Churner, 532 U.S. 731 734 (2001)). If a prisoner has not "satisfied the PLRA's exhaustion requirement, [his] case must be dismissed." Casanova v. Dubois, 289 F.3d 142, 147 (1st Cir. 2002).

The Plaintiff's motion for a preliminary injunction fails because he is unable to demonstrate success on the merits of his claims because he failed to exhaust his administrative remedies prior to filing his complaint. "The First Circuit has stated that to show a "likelihood of success […], plaintiffs must show 'more than mere possibility' of success –rather they must establish a strong likelihood' that they will prevail." Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 10 (1st Cir. 2012). As Plaintiff has seemingly failed to exhaust administrative remedies as required by the PLRA, the logical conclusion is that he lacks a likelihood of success on the merits." Cruz-Berrios v. Puerto Rico Department of Correction and Rehabilitation, et al., No. CIV. 16-CV-3155-RAM, 2019 WL 5858157 at *5 (D.P.R. November 8, 2019).

The Defendant respectfully requests that this Court dismiss the Plaintiff's Motion for a Preliminary Injunction for failure to exhaust his administrative remedies on all of the Counts raised in his Complaint.

---

[4] Exhaustion under the PLRA applies equally to ADA claims. "The plain language of the PLRA as well as Supreme Court and Ninth Circuit precedent lead us to conclude that exhaustion is required for ADA claims. O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060-61 (9th Cir.2007); Jones v. Smith, 109 Fed. Appx. 304, 307 (2004)("The plain language of [42 U.S.C.] § 1997e(a) requires prisoner actions under 'any' federal law to meet the exhaustion requirement and we thus decline Plaintiff's invitation to exempt ADA suits.")" Bernard v Wrenn, No. CIV. 07-cv- 327-SM, 2009 WL 44205 at *1 (D.N.H. January 6, 2009).

**b. The Plaintiff is Unable to Demonstrate Success on the Merits of his Claims against the Defendant for Alleged Violations of the Americans with Disabilities Act.**

The Plaintiff is unable to demonstrate that the denial of Suboxone is because of his disability, or that it is framed within a larger theory of discrimination. On the contrary the SCSD and NaphCare, Inc., have taken an individualized approach to Plaintiff's treatment, unlike the Defendant in Pesce v. Coppinger, 355 F. Supp. 3d 35, 47 (D. Mass. 2018), who had a blanket policy of denying all inmates Suboxone regardless of their situation. Here, the SCSD and NaphCare, Inc., have a robust MAT program with eighty three (83) pre-trial detainees and thirty-six (36) sentenced inmates currently receiving Suboxone. Unfortunately because of Mr. Mirabella's federal charge it has been determined that at this time he does not qualify for the program because he may unnecessarily face the risk of painful drug detoxification. (***See Exhibit 1, ¶ 15.***)

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2012). In order to establish a violation under Title II of the ADA, the Plaintiff must allege: "(1) that he is a qualified individual with a disability;[5] (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities…; and (3) **that such exclusion, denial of benefits or discrimination was by reason of his disability**." Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006), citing Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir. 2000).

"The ADA does not provide a remedy for medical malpractice, and "courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care." Kiman v. N.H.

---

[5] It is unclear whether the ADA applies to the Plaintiff because he was not in a recovery program with MAT prior to his incarceration but was using drugs illegally. The ADA states that someone using drugs illegally is not considered an "individual with a disability." Beth Schwartzapfel, When Going to Jail Means Giving up The Medications that Saved Your Life; How the Americans with Disabilities Act Could Change the Way The Nation's Jails and Prisons Treat Addiction, The Marshall Project, January 29. 2019, p. 6. However, for the purposes of this Opposition only the Defendant does not dispute this point.

<u>Dep't of Corr.</u>, 451 F.3d 274, 284 (1st Cir. 2006), and cases cited. Therefore, to fall within the ADA, "a plaintiff's showing of medical unreasonableness ... must be framed within some larger theory of disability discrimination." <u>Lesley v. Chie</u>, 250 F.3d 47, 55 (1st Cir. 2001). "For example, a plaintiff may argue that her physician's decision was so unreasonable ... as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes. Or ... a plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an **individualized** inquiry into the patient's condition." <u>Id.</u> at 284–85, <u>quoting</u> <u>Lesley</u>, 250 F.3d at 55. (Emphasis added.)

The Plaintiff alleges that the Defendant is discriminating against him because he has not been provided with the medication Suboxone, however the Plaintiff is unable to demonstrate that the Defendant's denial of this medication is by reason of his disability, or that it is framed within a larger theory of discrimination. To the contrary the SCSD and NaphCare have taken an individualized approach to the Plaintiff's request and their decision is based on their desire to ensure that he will not undergo a painful detoxification should he be sentenced to a federal facility without a MAT program.

While the Plaintiff relies upon the <u>Pesce</u> case to support his Motion for Injunctive Relief the Plaintiff's situation is dissimilar to that case, and does not support his argument. In <u>Pesce</u>, prior to the Plaintiff's anticipated incarceration, he was enrolled in a legally authorized treatment program for substance abuse at the Lahey Behavioral Services facility in Danvers, MA, where he was being treated with Methadone.[6] Pesce had been in active recovery with methadone for approximately two (2) years prior to his anticipated commitment with the Essex County Sheriff's Department. According to his doctor the Plaintiff "must continue to use methadone as part of his ongoing recovery, and he is not ready to be tapered off his medication." <u>Id.</u> Plaintiff's doctor opined that sudden involuntary withdrawal of treatment would cause the Plaintiff severe and needless suffering, jeopardize his long term recovery and … place him

---

[6] The Plaintiff was not receiving Suboxone because his doctor had determined that there are some people for whom Suboxone does not work. <u>Pesce</u> at 40.

at a high risk of overdose upon his release" particularly where the Plaintiff was only going to be incarcerated for sixty days. Id. at 41.

While Defendants in Pesce argued that they had a well-regarded treatment program the Court found that the Defendants' treatment program involved strategies that had **already proven ineffective** for the Plaintiff, as documented by his physician; however, the Court's analysis applied to Pesce only. The Court ultimately found that the Plaintiff had a likelihood of success on the merits because "the Defendants refusal to administer methadone **as prescribed** [before his anticipated incarceration] deprived him of the benefit of health care programs, and that such conduct constituted discrimination on the basis of his disability." Here, unlike in Pesce, Mr. Mirabella was not enrolled in a legally authorized treatment program with a valid prescription for Suboxone upon his incarceration with the SCSD on June 3, 2019, and he has not been denied treatment because of his addiction.

Further, while the Essex County Sheriff's Department's anticipated treatment strategies may have been ineffective for Pesce (the record documents five years of trying unsuccessful methods including attempts at detoxification) there is no evidence that Naphcare's mental health treatment of Mr. Mirabella has been ineffective. In fact Mr. Mirabella has not expressed concerns about the quality of his mental health treatment while incarcerated, and his stated reasons for requesting Suboxone were in the event that he was to be released, which no longer seems to be the case. (*Exhibits 1, 2, 7 and 8*) Lastly, the main impetus of providing Pesce with Suboxone during his brief sixty (60) day incarceration was to prevent him from going through what was described as a "severe and needless suffering due to detoxification." This is the same reason why Mr. Mirabella is not on Suboxone at the SCHOC, **to prevent him from going through the same painful detoxification process** upon his commitment to a federal facility that does not have a MAT program.

This case is also dissimilar to other recent cases in the First Circuit where Courts have considered Plaintiffs' requests to continue receiving Suboxone or other medications to treat their opioid use disorders

under the ADA. In all of those cases, similar to <u>Pesce</u>, Plaintiffs filed Motions for Injunctive Relief seeking a judicial order that they continue to be provided with **ongoing** Suboxone maintenance treatment at levels previously prescribed, prior to their incarceration.  <u>See</u> <u>Smith v. Aroostook County</u>, 379 F.Supp.3d 146 (2019)(The Plaintiff had been in active recovery for 10 years with Subutex, prior to her anticipated incarceration. The Court held that the Plaintiff's ADA claim was likely to succeed, where the County Jail did not have a MAT program, and could not guarantee that the Plaintiff would not be tapered off of her prescribed medication.); <u>Sclafani, Feinstein and Cappola v. Mici</u>, <u>et al</u>., No. 19-CV-12550 (D.Mass. 2019) (Plaintiff Sclafani had been receiving Suboxone in the community, and was tapered upon his incarceration with the MA Department of Correction ("**DOC**").  The two other Plaintiffs had also been receiving treatment in the community, and were still on Suboxone, upon their incarceration with the DOC, but it was anticipated that they would be tapered off of their medication after ninety (90) days.  The DOC put Plaintiff Sclafani back on Suboxone, and indicated that Plaintiff's Feinstein and Cappola would not be tapered off of their medication.)[7]

The Plaintiff's cursory Motion for Injunctive Relief, in which he demands that this Court order the Defendant to provide him with Suboxone, based upon his unsubstantiated claim of drugs at the SCHOC, does not state a claim under the ADA.[8]  "[B]are allegations of inadequate or negligent medical care, unaccompanied by facts suggesting a discriminatory animus, do not state a claim under Title II of the ADA." <u>Sepulveda v. Umass Correctional Healthcare</u>, 160F. Supp. 3d 371, 392 (2016).  <u>See</u> <u>Messere</u>, 2015 U.S. Dist. LEXIS 127667, at *34 (explaining that "it is not enough for [the Plaintiff] to allege that he received substandard medical treatment, as the ADA does not require the states to provide a certain level of medical treatment").  Rather, a plaintiff must show his physician's decision was discriminatory on its face either

---

[7] This case was settled by the parties before the Court entered a decision on the Plaintiff's Motion for a PI.

[8] The Plaintiff also asserts that he has overdosed in the past in support of his argument that he should be provided with Suboxone, (Dkt No. 3), however when he was recently asked by the PA if he had an overdose history his response was "no". (**Exhibit 2**)

"because it rested on stereotypes of the disabled" or because his treatment was "so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes." Kiman, 451 F.3d at 284 (quoting Lesley, 250 F.3d at 55) (internal quotation marks omitted).

The Defendant requests that this Court deny the Plaintiff's PI Motion where he fails to state a claim under Title II of the ADA against Sheriff Tompkins.

### c. Plaintiff Has Not Demonstrated A Strong Likelihood of Success against the Defendant With Respect To His Claims Based Upon the 8th and 14th Amendments.[9]

Mr. Mirabella alleges that the failure to provide him with the medication Suboxone constitutes deliberate indifference to his serious medical needs pursuant to 42 U.S.C. § 1983. Defendant Tompkins, in his individual capacity, may be held liable only on the basis of his **own acts or omissions**, and not for the conduct of the medical provider, NaphCare, or for the conduct of his subordinates under a theory of respondeat superior. Here, the Plaintiff has made no direct allegations against Sheriff Tompkins and therefore the Plaintiff does not have a likelihood of success against Sheriff Tompkins in his individual capacity under 42 U.S.C. § 1983.

The 8th Amendment protects inmates from "deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991). In order to prevail on an 8th Amendment deliberate indifference claim, Plaintiff must establish (1) an unusually serious risk of harm; (2) defendant's actual knowledge (or at least, willful blindness to) that elevated risk; and (3) defendant's failure to take obvious steps to address that known serous risk." Manarite v. Springfield, 957 F.2d 953, 956 (1st Cir. 1992) cert. denied, 506 U.S. 837 (1992). The standard for deliberate indifference is a stringent one, "requiring proof that a [State] actor disregarded a known or obvious

---

[9] Because Mirabella is a pre-trial detainee, his § 1983 claims are grounded in the Due Process Clause of the Fourteenth Amendment, rather than in the Eighth Amendment's proscription of cruel and unusual punishment, though the analysis is the same. See Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir.2002).

consequence of his action." Bd. Of the County Commrs. Of Bryan County v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382 (1997).

Mere negligent or reckless medical treatment does not constitute deliberate indifference. Rather, according to the First Circuit, deliberate indifference requires "more than ordinary negligence and probably more than gross negligence." Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1991), cert denied, 506 United States 837, 113 S.Ct. 113 (1992). Specifically, the Plaintiff must show that Defendants were grossly negligent and "intended wantonly to inflict pain." DesRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991).

1. **The Plaintiff is Unable to Demonstrate Success on the Merits of his Deliberate Indifference Claim against the Defendant, because he will be Unable to Show that his Care is so inadequate to treat a Serious Medical Need, and that the Defendant should have had Knowledge of this.**

### *(i)    Objective Prong*

The deliberate indifference test has an (i) objective and (ii) subjective prong. To satisfy the objective prong of the deliberate-indifference inquiry, an inmate must have a serious medical need and must show that the medical care provided by the prison for that need "'is not adequate' as measured against 'prudent professional standards.'" Nunes v. Massachusetts Dep't of Correction, 766 F.2d 136, 142 (1st Cir. 2014) (quoting United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987)). "A serious medical need is one that involves a substantial risk of serious harm if it is not adequately treated. Typically, it is a need that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Kosilek v. Spencer, 889 F.Supp.2d 190, 199 (2012) (overruled on other grounds by Kosilek v. Spencer, 774 F.3d 63 (1st Cir. (2014)).

In the instant action, Mr. Mirabella does not have a strong likelihood of success against the Defendant with respect to the objective prong of the deliberate-indifference inquiry, because he is receiving constitutionally adequate care for his medical conditions.

From June 3, 2019, to March 20, 2020, Mr. Mirabella, **did not file a single sick slip seeking Suboxone or mention treatment with Suboxone even once with his medical and mental health providers**. (*Exhibits 1, 2 and 7*) When Mr. Mirabella was committed to the Nashua Street Jail on June 3, 2019, he underwent a detailed intake process with medical staff and he was questioned about the medications that he was currently taking. (*Exhibit 1*) When medical staff confirmed his medications and treatment with outside medical providers there was no indication that he was on Suboxone in the community. (*Exhibit 1*) While Mr. Mirabella reported a history of opiate and cocaine use he informed medical staff that "he will not be detoxing here." (*Exhibit 1*)

From June 3, 2019, to the present he has been seen repeatedly by mental health clinicians on a regular basis, he has received extensive mental health counseling for bi-polar disorder and he has been seen by medical providers related to his complaints of neck, back and shoulder pain. (*Exhibits 1 and 2*)

Since his commitment to the SCSD the treatment that he has received is constitutionally adequate care for all of his medical conditions including drug addiction. While Suboxone treatment in jails and houses of correction may be considered the standard of care today for inmates with a drug addiction (See Pesce v. Coppinger, et al., 355 F.Supp.3d 35 (2018), it has not always been the standard of care. Further, the facts in this case are dissimilar to Pesce where the Plaintiff in that case was on a valid prescription for Suboxone upon incarceration; he was going to be tapered off of Suboxone; and he was due to be released within 60 days of incarceration. That is not the case with Mr. Mirabella. Rather, Mr. Mirabella is awaiting trial on a federal armed robbery charge; did not have a valid prescription for Suboxone upon his incarceration; and consequently was not detoxed off of this medication. Further, when Mr. Mirabella requested MAT it was due to the fact that he thought he was going to be released, not because he was concerned about drugs in prison.[10]

---

[10] In both the grievance and sick slip that Mr. Mirabella filed in March of 2020 he indicated that he wanted Suboxone to avoid overdosing should he be released from prison. (Exhibits 2 and Exhibit 8)

Mr. Mirabella has been provided with constitutionally adequate care, during his incarceration at both the Nashua Street Jail and the SCHOC, as measured against 'prudent professional standards'. Mr. Mirabella's medical history (**Exhibits 1 and 2**) demonstrates that medical staff has been responsive to his medical and mental health needs. While Mr. Mirabella has not been prescribed Suboxone, he has received numerous other medications to treat his complex mental health issues. Further, it is the opinion of Dr. Quirk that it is harmful to place someone on Suboxone who is facing the risk of a painful drug detoxification. (**Exhibit 1**)

Disagreements over the appropriate course of medical treatment do not support a claim of deliberate indifference to Mr. Mirabella's constitutional rights. Sirois v. Berman, 834 F.2d 9, 13 (1st Cir. 1987); Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981). A dispute over the best course of treatment is not actionable under § 1983. Siros v. Prison Health Serv. et al., 233 F.Supp.2d 52, 57-58 (D. Maine 2002). While the plaintiff may disagree with the recommendations of the medical providers "courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment." Watson v. Caton, 984 F.2d 537, 540 (1st Cir.1993); See Kosilek, 889 F.Supp.2d at 199 (overruled on other grounds by Kosilek v. Spencer, 774 F.3d 63 (1st Cir. (2014)) ("An inmate is not entitled to ideal care or the care of his choice. Courts must defer to the decisions of prison officials concerning what form of adequate treatment to provide an inmate. However, courts must decide if the care being provided is minimally adequate.") Here, as is discussed above, the care provided to Plaintiff Mirabella is far more than minimally adequate.

### (ii) Subjective Prong

In order to prove the subjective prong, the United States Supreme Court in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994), held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and

disregards an excessive risk to inmate health or safety; *the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.*"  Farmer, supra, at 837 (emphasis added).  Further, "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot…be condemned as the infliction of punishment."  Snell v. DeMello, 44 F.Supp.2d 386, 391 (D.Mass. 1999) (quoting Farmer, 511 U.S. at 838).

In the instant action, Mr. Mirabella also does not have a strong likelihood of success with respect to the subjective prong of the deliberate-indifference standard, because there is no credible evidence that the Defendant knew of and disregarded an excessive risk to Mr. Mirabella's health.  Further, as discussed above the evidence shows that the medical, mental health and MAT program staff have all been attentive to Mr. Mirabella, and have recommended treatment for Mr. Mirabella's legitimate medical needs. The staff has regularly and frequently evaluated his medical and mental health conditions with respect to his requests and has made adjustments to his medications and treatments. (***See Exhibits 1 and 2***).   Further, MAT program staff have been in frequent communication with Mr. Mirabella's criminal attorneys in order to determine the best course of action for him.

Mr. Mirabella does not contend that Tompkins actually concluded that staff was recklessly making decisions about medical care with actual knowledge of impending harm, that was easily preventable.  *See*, Feeney v. Correctional Medical Services, et al., 464 F.3d 158, 162 (2006)(Court held in defining deliberate indifference that "[t]he obvious case would be a denial of needed medical treatment in order to punish the inmate. But deliberate indifference may also reside in 'wanton' decisions to deny or delay care, where the action is recklessness, 'not in the tort law sense but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable.")

The medical provider for the SCSD has a MAT policy that allows for inmates committed to the SCSD to remain on Suboxone if they had a valid prescription in the community, which means that a

medical provider had already determined that Suboxone was medically necessary for their patient. Mr. Mirabella did not seek Suboxone for the first nine months of his incarceration, and did not exhibit any outward signs or symptoms that would have alerted medical staff of any difficulties that he was having. See "Corley v. Prator, 290 Fed Appx. 749, 752-753 (2008)(concluding that there was no eighth amendment violation where medical staff prescribed over the counter medications after examining the Plaintiff and where Plaintiff did not request methadone or mention that she was experiencing withdrawal.)" Pesce v. Coppinger, 355 F. Supp. 3d 35, 47 (D. Mass. 2018).

Mr. Mirabella does not have a likelihood of success on the merits of his civil rights claims against Sheriff Tompkins because there is no plausible claim that a) Mirabella's medical care is shockingly inadequate; or b) that this Defendant actually knew Mirabella was at substantial risk for serious harm where he did not have a valid prescription for Suboxone in the community immediately before his incarceration.[11] This is particularly true where the legislation signed by the Governor requires Sheriffs to provide MAT for inmates who were already receiving treatment thorough a legally authorized medical program or by a valid prescription **only**. The MAT program implemented by the SCSD and NaphCare is in compliance with this legislation, and is in compliance with recent case law in the First Circuit. See Pesce v. Coppinger, 355 F. Supp. 3d 35 (D. Mass. 2018); and Smith v. Aroostook County, 379 F.Supp.3d 146 (2019), where both of these cases concerned Plaintiffs' requests to remain on their previously prescribed prescriptions for Suboxone in the community.[12]

Accordingly, the Defendant respectfully request that this Court find that Mr. Mirabella will be unlikely to succeed on the merits of his civil rights and ADA claim against the Defendant, where he did not

---

[11] See Chapter 208 of the Acts of 2018 HB 4742, (**Exhibit 2**) which requires Sheriffs "to provide medication-assisted treatment to a person in the custody of the facility, in any status, **who was receiving medication-assisted treatment for an opioid disorder through a legally authorized medical program or by a valid prescription immediately before incarceration.**" The Defendant also has a Qualified Immunity Defense which goes to Plaintiff's likelihood of success on the merits.

[12] Further evidence of the SCSD's compliance and commitment to this program is the fact that it currently has 155 patients enrolled in its MAT program who are prescribed Suboxone. **(Exhibit 7)**

have a valid prescription for Suboxone upon his incarceration, he was not tapered off of Suboxone, and the Defendant has not denied Suboxone based upon his disability.

## II.     <u>FAILURE TO ISSUE THE PRELIMINARY INJUNCTION WOULD NOT RESULT IN IMMINENT AND IRREPARABLE HARM</u>.

Plaintiff will <u>not</u> suffer imminent and irreparable harm should the Court deny Mr. Mirabella's Motion for a Preliminary Injunction. To the contrary it is the position of Dr. Quirk that it is harmful to place a patient like Mr. Mirabella on Suboxone unless there is a clearly delineated continuity of care plan upon release from the SCSD. Here, where there is no continuity of care plan for Mr. Mirabella at this time, in light of his federal charge, he may face the unnecessary risk of a painful drug detoxification if this Court orders that he be provided with Suboxone.

## III.     <u>THE BALANCE OF HARDSHIPS TILTS IN THE FAVOR OF THE DEFENDANTS AND THE ISSUANCE OF AN INJUNCTION WOULD BE AGAINST PUBLIC INTEREST</u>.

The issuance of an injunction regarding the medication Suboxone would cause undue hardship to the Defendant, and to NaphCare, as it relates to the management of the MAT program at the SCSD, and it would place the Court in the position of micro-managing the care and treatment of Mr. Mirabella, and of second-guessing the SCSD's treatment of him.[13] This is particularly so where Mr. Mirabella did not have a valid prescription for Suboxone upon his entry to the Nashua Street Jail, which is what the legislation passed by the Governor entails, as well as NaphCare's MAT policy.

**WHEREFORE**, the Defendant requests that this Court deny Mr. Mirabella's Motion for a Preliminary Injunction for Suboxone for the reasons stated above.

---

[13] <u>See</u> <u>Cryer v. Spencer,</u> et. al. 2012 WL 892883 (D Mass. March 15, 2013) (The Court relied on the principle that deference should be afforded to the judgment of administrators of correctional facilities on matters of prison safety, security and discipline to find that at the PI stage of the proceedings it would not be in the public interest to allow the motion for a PI)

Respectfully submitted,
Sheriff Steven Tompkins

By Attorney,
MAURA HEALEY
ATTORNEY GENERAL
Allen H. Forbes
Special Assistant Attorney General

/s/ Melissa J. Garand
Melissa J. Garand
Assistant General Counsel
BBO No. 554727
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA  02114
(617) 704-6680
mgarand@scsdma.org

Dated:  October 23, 2020

## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Court's electronic filing system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 23, 2020.

/s/ Melissa J. Garand
Melissa J. Garand